EVERETT L. CRAWFORD and S. CLINTON SHERWOOD, as Trustees under the Last Will and Testament of HENRY DEXTER, Deceased, Respondents, *v.* CLARISSA TREADWELL DEXTER and Others, Appellants, Impleaded with the SALVATION ARMY and Others, Respondents.

First Department, July 13, 1917.

**Will construed — trust for benefit of incompetent — disposition of accumulated income — gift of entire income subject to payment of specific bequests.**

A testator created a trust for the benefit of his incompetent daughter who was his only heir at law. Provisions of the will examined, and *held*, that a gift was created to the daughter of the entire income from the trust fund, subject to the payment of certain specific bequests;

That the trustees are administrators of the income and not disposers thereof, and have no power to use the same to increase the shares of the residuary legatees;

That their discretion is limited to determining how much of the income shall be expended for the benefit of the daughter during her incompetence, and that they are made custodians of the balance;

That there was no direction for an illegal accumulation of income.

APPEAL by the defendants, Clarissa Treadwell Dexter and others, from parts of a judgment of the Supreme Court in favor of the respondents, entered in the office of the clerk of the county of New York on the 6th day of July, 1916, upon the report of a referee appointed to hear and determine the issues.

*William Mason Smith,* for the appellants Mary G. Dexter and others.

*Albert W. Putnam* [*George Roberts* with him on the brief], for the appellant S. Clinton Sherwood.

*Robert Grier Monroe* [*Lee McCanliss* with him on the brief], for the appellant Clarissa T. Dexter.

*Walter E. Hope* [*Sinclair Hamilton* with him on the brief], for the plaintiffs, respondents.

*Grenville T. Emmet* [*Allan S. Locke* and *Robert Thorne* with him on the brief], for defendants Midnight Mission and others, respondents.

*William C. Beecher,* for the New York Society for the Suppression of Vice, respondent.

*Charles H. Beckett* [*Madison H. Ferris* with him on the brief], for the Salvation Army, respondent.

*Francis Smyth,* for the New York Association for Improving the Condition of the Poor, respondent.

*W. H. Van Steenbergh,* for American Tract Society, respondent.

*Fancher Nicoll,* for the American Bible Society, respondent.

*George N. Whittlesey* [*Stanley W. Dexter* with him on the brief], for the Children's Aid Society, respondent.

*Herbert S. Schoonmaker*, for Young Men's Christian Association, respondent.

DOWLING, J.:

Henry Dexter died on July 11, 1910, leaving a last will and testament executed October 6, 1906, and eight codicils thereto, all of which were duly admitted to probate by the Surrogate's Court of New York county. He left him surviving as sole heir at law his daughter, Clarissa Treadwell Dexter, who has been continually of unsound mind for many years and who was confined in Bloomingdale Asylum as early as 1883, remaining there until 1894, since which time for the greater part of the period she has been residing and cared for in her father's home, and since his death in the family home. Her disease is incurable, although she has never been judicially declared incompetent nor has any committee of her person or property been appointed. Decedent's estate at the time of his death was valued at $1,400,797.90. By his will a trust was created under the 4th paragraph thereof, which is the source of the controversy between the parties hereto and which reads as follows:

" *Fourth.* I give, devise and bequeath all the rest, residue and remainder of my property and estate, real, personal and mixed, wheresoever and whatsoever, which I may own, or be in any wise entitled to at the time of my decease; unto my executors hereinafter named, or such of them as shall take upon themselves the execution of this my Will, and the survivors and survivor of them, IN TRUST, for the following uses and purposes:

" 1. To pay and discharge all transfer or succession taxes upon all the bequests and devises contained in this my Will, so that no legacy or devise specifically given therein may suffer diminution by reason of such taxes; but such taxes shall be paid out of the residue of my estate.

" 2. To apply the interest or income of the said rest, residue and remainder of my property and estate (after payment of such taxes), or so much thereof as may be necessary in their best judgment and discretion, but not less than Five

thousand dollars per annum, to the care, support, maintenance, benefit and use of my daughter Clarissa Treadwell Dexter, for and during her natural life, such care, support, maintenance, benefit and use to include all proper attendance, such as she is now receiving, and also such additional care, support, maintenance, benefit and use as shall thereafter become necessary or proper for her health, well being, comfort and happiness.

" 3. If at any time my said daughter shall recover her mental and physical health, so as in the opinion of my executors, or those taking upon themselves the execution of my Will, or the survivors or survivor of them, to render it proper and safe to do so, then I hereby authorize them to pay over to my said daughter, the whole of the interest and income of said rest, residue and remainder of my said property and estate not theretofore disposed of by them in payment of legacies under the power and authority hereinafter given to them.

" 4. It is my desire that my present residence Number 42 West Fifty-sixth Street in the Borough of Manhattan, City of New York, shall be maintained for my daughter's occupancy during her life, and that she shall be surrounded with everything which shall make for her comfort and pleasure, the number in service in the home being maintained as I would have it if living and as befitting one in her station in life. Her every wish shall be respected — with regard to her pleasure and whether she shall remain at home or travel, etc.— when in the judgment of the majority of my executors it shall not seem unwise so to do.

" 5. At the end of each year of their trusteeship, whatever funds may remain of the income of my estate, after the payment of all bills for the proper maintenance of my daughter, my executors shall have the power and it is my desire that out of the remaining income they may pay the pecuniary legacies bequeathed herein to individual legatees in whole or in part *pro rata*, until such legacies shall be wholly paid; and when such legacies to individuals shall have been wholly paid, my executors shall in like manner out of said remaining income pay *pro rata* on account of the pecuniary legacies to corporations bequeathed herein (other than gifts of the residue

of my estate) until such legacies to corporations shall be fully paid; unless in any year it should in the judgment of my executors seem unwise to do so, keeping in mind always the sufficiency of my daughter's income. And I also authorize my executors at any time during my daughter's lifetime if they shall deem it proper and safe to do so, to transfer to the Protestant Episcopal Mission in Mexico, the shares of the capital stock of the Woodlawn Cemetery bequeathed to them herein; but in no other respect shall my executors pay over or distribute the principal of said trust fund during the lifetime of my said daughter, than to transfer said shares of stock of the Woodlawn Cemetery as above indicated.

" 6. My executors and trustees are authorized to retain the securities in which my estate shall be invested at the time of my decease and they need only change such investments when in their judgment it shall make for the better security of my daughter's income."

By the 5th paragraph of his will the testator provided: "After the decease of my daughter Clarissa Treadwell Dexter, I hereby direct my executors to dispose of the said rest, residue and remainder of my property and estate in manner following: * * * " Then followed directions for the payment and transfer of twenty-five shares of the capital stock of the Woodlawn Cemetery to the Protestant Episcopal Mission in Mexico, and to certain individuals pecuniary bequests aggregating $39,000, and to three corporations pecuniary bequests aggregating $1,200. Then by the 7th paragraph of his will testator directed:

" Seventh. All of the trust fund constituted by the Fourth Paragraph of this my Will, that shall remain undistributed by my executors at the decease of my said daughter after payment in full, whether before or after her decease, of all the legacies directed to be paid in the Fifth Paragraph of this my Will, I hereby direct my executors, or the ones taking upon them the execution of this my Will, or the survivors or survivor of them, to distribute as follows, that is to say; my executors shall pay to the following legatees the sums of money which I give and bequeath to them respectively, to wit:"

Then follow bequests to certain charitable organizations

which, as ultimately fixed by the 8th codicil to his will, aggregate $972,000. The 9th paragraph of his will provided:

" I hereby make, nominate and appoint my nephews by marriage, Everett L. Crawford and Henry U. Palmer and my friend S. Clinton Sherwood, executors of this my last will and testament, and as I expect and desire that said S. Clinton Sherwood shall take the most active part in the management of my estate and the care and maintenance of my daughter under the trust herein established for her benefit, but that he shall always act with the advice and approval of the two other executors, or such of them as shall qualify, I direct that the sum of Fifteen hundred dollars per annum be paid to S. Clinton Sherwood out of the income of my estate as special compensation for such extra care and management, in addition to all commissions which he would be entitled to by law as such executor and trustee if no special compensation were given to him herein."

Outside of the 7th paragraph of his will, the opening clause of which has been quoted, there is no general residuary clause of the usual type in the original will; but his 1st codicil thereto bearing date the same day as the will itself provided:

" In case my estate remaining undistributed as mentioned in the Seventh Paragraph of my said Will, shall not be sufficient to pay in full all the bequests contained in said Seventh Paragraph, then I direct my executors first to pay in full the bequests therein made to the Salvation Army in the United States, the Young Men's Christian Association of the City of New York and the American Bible Society, and to pay the rest of said legacies *pro rata.*

"And if it should happen that anything should remain of my estate after paying in full all of the bequests given by my said Will, then I direct that such surplus shall · be divided equally between the three corporations last above named.

"And in all other respects I hereby ratify and confirm my said Last Will and Testament."

By the 7th codicil, executed December 31, 1909, testator revoked the appointment of Henry U. Palmer as one of his executors and trustees, and further provided:

" Item. In case it should appear at or after my decease that I have devised and bequeathed to benevolent, charitable, literary, scientific, religious or missionary societies, associations or corporations, in trust or otherwise, more than one-half of my estate, after the payment of my debts, and that for any reason such devises or bequests are invalid to some extent; then and in such case only, I hereby give, devise and bequeath to my friend Mr. S. Clinton Sherwood, all that portion of my estate as to which such devises or bequests may be invalid, and which otherwise would descend or be distributed to, or among my heirs, or next of kin."

The questions arising for determination upon this appeal have to do with the disposition to be made of the accumulated income of the estate. The income from the trust estate is over $60,000 a year, and the amount expended on behalf of the testator's daughter has averaged $20,000 a year. On September 15, 1913, at the end of the first year of trusteeship, the unexpended income had increased to $167,489.27. Thereupon, pursuant to the power conferred by section 5 of the 4th paragraph of the will, the trustees paid out of the surplus income all the pecuniary legacies, aggregating $40,200, bequeathed by the 5th paragraph of the will, and such payments were concededly authorized. The amount of accumulated income was thus reduced to $127,289.27, but by April 27, 1915, it had increased to $209,845.96. It is contended on behalf of the testator's daughter and her presumptive next of kin (being her nieces) that the entire income belonged to the daughter with the exception only of the sum of $40,200 heretofore paid by the trustees pursuant to the provisions of the 5th paragraph of the will; that the trustees are authorized and empowered to apply so much of the net income from the testator's trust estate as is required for the care, support and maintenance of his daughter, and to hold the remaining net income not so expended, if any, as custodian for the said daughter for her future benefit, to be paid upon her recovery to her or from time to time to any committee of her property that may be meanwhile legally appointed, or, if not so paid, upon her death to her executors or administrators; that the trustees have power, with the acquiescence of S. Clinton Sherwood, to apply the whole of the net income of the said

trust fund for the use and benefit of the said daughter during her life; that testator's will does not empower S. Clinton Sherwood to determine in their or his discretion what the share of the testator's daughter in the income of the trust fund shall be, or how much of the income is bequeathed to her, but merely empowers Sherwood to determine in his discretion how much of the income bequeathed to her shall be expended for her benefit, and makes the trustees custodians of the unexpended balance during the time that Sherwood shall deem the testator's daughter mentally incompetent; that there is an absolute disposition of the net income of the said trust (except the sum of $40,200) to the testator's daughter, qualified only as to the manner of payment and enjoyment as hereinbefore stated; that the will contains no express direction for an illegal accumulation of income, and in so far as it contains any implied direction for accumulation of income such implied direction, being invalid, will be deemed surplusage and eliminated from the will, the entire income from the said trust fund being otherwise validly disposed of by the will itself.

The charitable organizations to which the testator bequeathed an aggregate of $972,000 contend that the surplus income of each year did not vest in the decedent's daughter; that there was no effectual disposition of the surplus income under the will, and that consequently the surplus income for each year belongs to those presumptively entitled to the next eventual estate, being the charitable corporations to which the specific bequests of $972,000 were made, and who claim as well the residuary estate of $326,810.33, which they have been awarded by the judgment herein.

S. Clinton Sherwood contends that the unexpended income did not belong to the testator's daughter but should be paid *pro rata* on account of the specific legacies to the corporations named in article 7 of the will, and that if the charitable corporations should receive all of such unexpended income during the daughter's lifetime and then upon her death all the principal of the trust fund, there would be a gift of more than one-half of the testator's estate (less his debts) to charitable corporations, coming within the prohibition of the Decedent Estate Law (Consol. Laws, chap. 13 [Laws of 1909,

chap. 18], § 17); and that, therefore, under the specific gift to him contained in the 7th codicil, he is entitled to receive a present vested interest, subject only to the provision in favor of the daughter, in that portion of the testator's estate over and bove the one-half thereof which may properly be paid to such charitable corporations.

The learned referee has held that the testator did not intend to leave the surplus income from the trust fund to his daughter, and that there was no valid direction for its accumulation, nor was there any effectual disposition of the surplus income; and that, therefore, that portion of the income not expended for the daughter's benefit was not disposed of by the will but passed by operation of law to the charitable corporations as owners of the next eventual estate; and that, therefore, the statute had not been violated.

As I read the testator's will, its provisions are inconsistent with an interpretation which would give to the daughter less than the whole income of the trust estate, subject to the exercise of the discretion of the executors as to how much thereof should be applied to her care and maintenance, but in no event less than $5,000. This discretion by one of the codicils is vested in Sherwood. The 3d subdivision of the 4th paragraph, as will be seen, authorizes the executors to pay to the daughter when in their opinion she recovers her mental and physical health, the whole of the interest and income of his property not used to pay legacies, and those legacies, as will hereafter be seen, are only the ones specified in the 5th paragraph of his will, aggregating $40,200, and which have already been paid. The care with which these comparatively small legacies are authorized to be paid out of surplus income and the larger legacies withheld for payment until her death, is evidence in itself of the fact that the testator did not contemplate that the surplus income each year over what was expended on his daughter should be exhausted in paying off nearly $1,000,000 of legacies left to charitable corporations. The payment of the $40,200 of legacies would not have made an appreciable difference to the income for more than a single year, and those legacies were of an intimate and personal kind which the testator evidently wished to have paid off as speedily as possible.

The only clause of the will from which an intention is spelled out that the unexpended trust income should not belong to the daughter is the 7th, which provides that all the trust fund constituted by the 4th paragraph that should remain undistributed by the executors at the decease of his daughter, after payment in full of the legacies directed to be paid in the 5th paragraph of his will, be distributed in a certain manner. But this does not seem to me to be controlling in view of all the other provisions of the will, and in view of the further fact that the $40,200 of legacies were not required to be paid by the executors out of surplus income, but were only authorized so to be paid, and it might well have been that the executors might have deemed it unwise to pay these legacies out of surplus income, in which case the language just quoted would have been apt. Nor is the provision of the 6th codicil, by which a trust fund of $10,000 was created for the purpose of paying a reward to the person who might give information which should lead to the conviction of the person guilty of the murder of his son (which trust was to be held during the joint lives of the two trustees, Crawford and Sherwood), and further providing that the income accruing from said sum, so far as the same should not be needed for advertising, should be applied as directed in his will for the application of income from his estate or, failing such direction, should form part of the residue of his estate. This language is not controlling, for it might well have been framed to meet the possibility of the daughter's death before the expiration of this $10,000 trust, and in any event it is not sufficient to destroy the force of the testator's intent as gathered from the rest of the will.

That the language used by the testator created a gift to the daughter of the entire income from the trust fund (subject only to the payment of the specific bequests of $40,200) is well supported by the authorities. The decision in *Matter of Hoyt* (116 App. Div. 217; affd. without opinion, 189 N. Y. 511) is very closely in point. There the testator gave his executors a trust fund and directed them to " keep the same invested and to collect and receive the interest, dividends and income therefrom and from each and every part thereof and to apply to her use for and during her natural life in

the most bounteous and liberal manner as to expenditure and so as to promote her convenience and comfort and gratify her reasonable desires, the said interest, dividends and income so to be collected and received as the same shall be required for her use and benefit;" further "that the said sum of money hereinabove in this article directed to be appropriated and held in trust for and during the natural life of my daughter, Mary Irene, and for her use as above herein provided as to the interest, dividends and income therefrom, or the securities in which the same shall be invested, and any surplus of income therefrom, if any, which shall not have been applied to her use during her natural life shall, on the death of my said daughter, go and be distributed to and among" certain persons named. The court said: "If it be assumed that the intent of the testator was to give the remaindermen the surplus income which the trustees determined was not necessary for the use of the daughter, then the gift is invalid as involving an unlawful accumulation. The statute limits the accumulation of income to the period of minority. (1 R. S. 726, §§ 37, 38.) If it be true, as contended by the respondents, that the testator intended to lodge in his trustees a discretion as to the amount of income to be applied to his daughter's use, then this necessarily clothed them with authority to accumulate the residue (*Cochrane* v. *Schell*, 140 N. Y. 516), which authority could not be enforced inasmuch as it contravenes the provisions of the statute with reference to accumulations. But the trustees, acting under a void authority, did accumulate a surplus, and now the question is presented, to whom does it belong? The surrogate assumed that it passed to the remaindermen under the provision of the statute which provides that ' When, in consequence of a valid limitation of an expectant estate, there shall be a suspense of the power of alienation or of the ownership, during the continuance of which the rents and profits shall be undisposed of, and no valid direction for their accumulation is given, such rents and profits shall belong to the persons presumptively entitled to the next eventual estate.' (See 1 R. S. 726, § 40; Real Prop. Law [Laws of 1896, chap. 547], § 53.) The conclusion of the surrogate is correct, if the statute is applicable. I do not think it is. The rule

seems to be well settled that where the direction for an accumulation is void, and there is some other and legal disposition of the rents and profits, the statute does not apply; that in such case the direction for accumulation should be eliminated from the will.

" The direction to accumulate in this will can be stricken out and there then still remains a valid disposition of the rents and profits. The testator gave the fund to the trustees to collect the income from each and every part of it. He clothed his trustees with power to apply the entire income to the use of his daughter. He also clothed them with power, in their discretion, if they did not think she needed all of the income, to accumulate it, and if they did so, he gave it to the remaindermen. The authority, as we have seen, to accumulate is void but the authority to pay the entire income to the daughter is nevertheless valid and enforcible. If this be true, then the daughter was entitled to the entire income and whatever had accrued at the time she died passed to her representatives. This conclusion, it seems to me necessarily follows from the rule laid down in *Pray* v. *Hegeman* (92 N. Y. 508), and *Barbour* v. *DeForest* (95 id. 13)."

In *Hill* v. *Guaranty Trust Co.* (163 App. Div. 374) the testatrix gave her residuary estate to her executors and trustees upon the following terms: " To receive the rents, issues, income and profits thereof and to apply the whole, or such portions of such rents, issues, income and profits, as my said executors and trustees may deem advisable, for the use and benefit of my son   *   *   *   during his natural life, and on the death of my said son I give, devise and bequeath all of said rest, residue and remainder of my estate with the accumulations, if any, thereon   *   *   *   to my said sister Marie Hill absolutely and forever." The son at the time of the execution of the will was a life convict and after his mother's death became insane and was still so when suit was brought. The executors at the time of the accounting had applied only a small portion of the income to his use and the remainderman sought to have the accumulated income paid to her as the person presumptively entitled to the next eventual estate. This was refused, the court saying, in part: " Although a considerable surplus has been accumu-

lated, it is by no means certain that circumstances may not arise, before the termination of the trust, under which the trustees might deem it advisable to apply all this income to the use and benefit of the beneficiary. The direction to apply so much of the income as the trustees may deem advisable does not mean that they must determine, upon receipt of each payment of income, how much thereof shall be applied to the use and benefit of the beneficiary; on the contrary, I think the testatrix plainly intended that they should hold, subject to his use, all the income, irrespective of the amount immediately applied. Such a direction is not necessarily invalid. In *Bloodgood* v. *Lewis* (209 N. Y. 95) the will of the testator gave the income from a quarter of his estate to his daughter Mary, providing that if Mary, in the judgment of his daughter Rosetta, should continue to be of unsound mind and incapable of managing her own affairs, the income should be paid to Rosetta to be applied by her in the care and comfort of Mary. By a codicil he provided that, owing to Rosetta's feeble health, he made the trustees the judges of Mary's condition in place of Rosetta, and directed them, if they considered Mary incapable of managing her own affairs, to pay to Rosetta so much of the income of the trust fund for Mary as, in their discretion, might be required for her comfortable care and support. There being no direction for the immediate payment of the residue of the income to any one, this court held that the accumulated residue was an unlawful accumulation and belonged to the persons presumptively entitled to the next eventual estate. (*Bloodgood* v. *Lewis*, 146 App. Div. 86.) The Court of Appeals, however, held that the entire income was given to Mary under the will and that the codicil did not revoke the gift, but rather empowered the trustees ' to determine, in their discretion, how much of the one-fourth equal part bequeathed to her should be expended for her benefit, and made them custodians and conservators of the unexpended balance.'

" There is, therefore, in the present case nothing unlawful in the trustees holding the unexpended balance in their hands — certainly not if the will of the testatrix be construed as giving the entire income to her son. Whether the will should be so construed is a question which is not necessary to deter-

CRAWFORD *v.* DEXTER.                            777

App. Div.]              First Department, July, 1917.

mine at this time. It does dispose of the remainder 'with the accumulations, if any, thereon,' but the word ' accumulations ' in this connection does not necessarily refer to the income. But however that may be, I am clearly of the opinion that the testatrix intended that the income not immediately applied to the use of her son should be held by the trustees subject to his use during his life. If, in order to effectuate this intent, the will must be construed as giving him the entire income, the time and manner of payment being left to the discretion of the trustees, it is susceptible of this construction and should be so construed, but the question may never arise. Under the statute (Real Prop. Law [Gen. Laws, chap. 46; Laws of 1896, chap. 547], § 53; now Real Prop. Law [Consol. Laws, chap. 50; Laws of 1909, chap. 52], § 63), which is also applicable to personal property ( *United States Trust Co.* v. *Soher*, 178 N. Y. 442; *Mills* v. *Husson*, 140 id. 99; *Cook* v. *Lowry*, 95 id. 103), the plaintiff is entitled to the income not applied to the use of the beneficiary only upon the ground that such income is undisposed of. For the reasons stated the income now in the hands of the trustees cannot be so considered, because the trustees have the right at any time to apply any or all of it to the use of the beneficiary. Until the trust has terminated it will be impossible to tell how much, if any, of it will remain undisposed of.

" If this conclusion be correct, then the trustees should continue to hold the income not immediately applied, subject to its future application, if they deem it advisable for his use and benefit."

In *Matter of Bavier, No. 1* (164 App. Div. 358), where there was a trust fund created for the benefit of a feeble-minded person, the court cited with approval *Hill* v. *Guaranty Trust Co.* (*supra*) and said: " This court, reviewing the authorities, held that the will did not, either expressly or by necessary implication, direct any accumulation of the income; that although a considerable surplus had been accumulated, it was by no means certain that circumstances might not arise, before the termination of the trust, under which the trustees might deem it advisable to apply all this income to the use and benefit of the beneficiary, and that the trustees should continue to hold the income not immediately applied,

subject to its future application, if they deemed it advisable, for the *cestui que trust's* use and benefit.

" We think, as the question here involved has so recently been determined by that well-considered case, it is unnecessary to discuss it further."

In *Matter of Bavier, No. 2* (164 App. Div. 363), the will gave to the trustees two-thirds of the net rents, issues and profits of certain real estate in trust to apply the same or so much thereof as testator's wife during her life or the surviving trustees after her death might think necessary or proper for the care, education, maintenance and support of the testator's daughter and such issue as she might have. The daughter was an incompetent, although not judicially declared so to be. The will then provided that upon the daughter's death the income from the trust fund with any and all surplus thereof unexpended, if any, should be divided in certain alternative ways. There was also a direction that if, under the provisions of the will, there should remain in the hands of the trustees accumulations of the net rents, issues and profits not authorized by the laws of the State of New York, the same should be regarded as real property and be distributed according to the statutes of New York relating to descent. Upon the accounting there was found a balance of unexpended income which the surrogate held to be an unlawful accumulation and, therefore, under the will distributable according to the Statute of Descent. This court said: " There is no express provision in this will for any accumulation of income, and the direction for the distribution of such is only precautionary and made in view of the discretionary power vested in the trustees by the 4th clause of the will. The conclusions reached by Mr. Justice CLARKE in *Matter of Bavier, No. 1* (164 App. Div. 358) are found upon considerations equally applicable to the case at bar and require a like disposition of the present appeal."

It will be seen that in this last cited case there was an express disposition of accumulated income, as in the case at bar. We deem it unnecessary to cite further the cases in line with these determinations, believing that they sufficiently establish the law applicable to the question before us. The testator's clear intention as deducible from the will being that

his daughter should have the entire income of the trust fund (except $40,200) applied to or available for her use as long as she should live, his intention should be carried out. This limits the discretion of the trustees or Sherwood to determining how much of the income bequeathed to Miss Dexter shall be expended for her benefit and makes the trustees custodians of the unexpended balance for her as long as she is deemed incompetent, and does not (as would the contrary view) substitute them for the testator and allow them to reduce her share and increase that of the residuary legatees at will. In other words, they are what they should be, administrators of the fund only, and not disposers of it. We agree with the learned referee in his conclusion that the discretionary power given to the trustees under paragraph 4, subdivision 5, of the will is limited to the legacies specified in paragraph 5 of the will and that it was neither the intention nor direction of the testator that the bequests to the $972,000 class should be paid out of unexpended income.

The conclusions of law found by the learned referee herein should be modified by including the nine conclusions of law proposed on behalf of the defendant Clarissa Treadwell Dexter, and the appropriate findings of fact in connection therewith, and by reversing the findings of fact and conclusions of law inconsistent therewith, and the judgment appealed from will be modified accordingly, so as to adjudge that the defendant Clarissa Treadwell Dexter is entitled to the entire net income of the trust created in and by said will for her life, with the exception only of the sum of $40,200 heretofore paid by the plaintiffs pursuant to the provisions of the will to the legatees mentioned in paragraph 5 thereof Costs and disbursements are awarded to all parties appearing upon this appeal, payable out of the estate.

CLARKE, P. J., LAUGHLIN, SMITH and PAGE, JJ., concurred.

Judgment modified as directed in opinion, with costs to all parties appearing upon this appeal, payable out of the estate. Order to be settled on notice.

In the Matter of the Probate of a Paper Propounded as the Last Will and Testament of MARY SWEENY, Deceased.

MARGARET SWEENY and Others, Appellants; DENIS SWEENY, Respondent.

First Department, July 13, 1917.

Will — probate contested on grounds of fraud and undue influence — evidence not justifying verdict for contestants — evidence — past transactions showing family history.

Appeal from a decree of the Surrogate's Court denying probate of a will upon the ground that the execution thereof was procured by fraud, deceit and undue influence. The testatrix left her estate to her daughters and gave to her sons only nominal bequests upon the ground stated in the will that they had, during her husband's lifetime, received ample advancements from him, etc. Evidence examined, and held, absolutely insufficient to support a finding of fraud or undue influence by the jury, and that the decree of the surrogate should be reversed and the will admitted to probate.

In such proceeding in the Surrogate's Court it was error to take evidence otherwise clearly inadmissible, upon the theory that it would place upon the record the whole history of the family of the testatrix.

APPEAL by Margaret Sweeny, proponent, and others from a decree of the Surrogate's Court of the county of New York, entered in the office of said Surrogate's Court on the 6th day of July, 1916, denying probate to a paper propounded as and for the last will and testament of Mary Sweeny, deceased, and also from an order entered in said Surrogate's Court on the 23d day of March, 1916, denying their motion to set aside the verdict of the jury herein.

*Michael J. Horan*, for the appellants.

*Jay Noble Emley* [*John Edmond Hewitt* with him on the brief], for the respondent.

DOWLING, J.:

Mary Sweeny died in the county of New York January 24, 1915, leaving a last will and testament dated July 21, 1914, whereby she left each of her three sons, Denis, James and Joseph, the sum of $50, stating that she made no other provision for them as her husband during his lifetime had made ample provision by transferring his business to them and advancing them large sums of money. To her daughter

Mary she left $10,000, to her daughter Esther $15,000, and the residue of her estate to her daughter Margaret. She had made a prior will October 25, 1910, by which she had left each of her sons $5, giving the same reason for her action, dividing the residue of her estate among her three daughters equally after leaving a granddaughter $1,000. The will was originally contested upon all the grounds usually urged, but on the trial the evidence was directed to the issue of undue influence and the case was submitted to the jury on that ground alone. The decree recites that the execution of the will was procured by fraud, deceit and undue influence and probate is refused for that reason. No useful purpose would be served by discussing at length the evidence in the case, in view of the fact that, in our opinion, the record is absolutely devoid of any testimony which in the slightest degree tends to support the verdict of the jury. There is nothing in the evidence which justified the submission of the issue to the jury, and the motion made at the close of the case by the attorney for the proponent to direct a verdict on the ground that the contestant had failed to sustain his objections should have been granted. There are many rulings upon questions of evidence which in themselves would have called for the reversal of the decree and the granting of a new trial, were it not for the conclusion we have reached as to the failure of the contestant to make out any case whatever. The history of the Sweeny family was allowed to be given in evidence before the jury for the purpose of exciting their sympathy or prejudice, and statements made by the husband of the decedent over twenty years ago were allowed to be given in evidence by the contestant, including statements made by the husband of testatrix (not in her presence) that he had turned his property over to her for the purpose of keeping it in her name until she died and then for her to give it to her children share and share alike. The contestant was allowed to testify as to injuries received by his brother James in the business and the circumstances under which he received them; he was also allowed to testify to all manner of personal transactions with his father and the details of his business with him, including alleged advances made to his father over twenty years before towards the purchase of

certain real estate; also to what his father told the contestants' wife to do; also to transactions with his mother in his efforts to obtain loans from her eight or nine years before the will was made; with a variety of other incompetent and objectionable testimony, all of which was received in evidence upon the apparent theory, as was said in ruling upon the admission of one line of improper testimony, " This is simply to get in the whole history of the Sweeny family." The jury evidently did not decide the questions submitted to them upon the testimony, for there was absolutely no testimony upon which they could have founded their verdict. They must have decided the case upon the same theory which apparently was indicated by the learned surrogate when improper evidence was sought to be introduced in relation to the dealings of a firm composed of two of the sons and the wife of the contestant. In ruling upon the objection the learned surrogate said: " I will admit it on the question of undue influence. If this man was the one who created the business and was the brains of the family, it would have a bearing on that question, whether, under the conditions, his mother should not take care of him, and it is on that theory that I admit it." To this the appellants took exception.

There is no question whatever that Mary Sweeny was mentally competent to make a will; there is no question that her will was properly executed. The record is barren of any evidence justifying the finding of undue influence, fraud or deceit upon the part of anybody, even with all the improper and incompetent testimony in the record which was received upon the trial. Not only was there no evidence to support the verdict, but there was no evidence to warrant the submission of the issue of undue influence to the jury, and the motion to direct the probate of the will should have been granted.

The decree and order appealed from will, therefore, be reversed, with costs, and the will of the decedent ordered to be admitted to probate.

CLARKE, P. J., SMITH, PAGE and SHEARN, JJ., concurred.

Decree and order reversed, with costs, and proceeding remitted to Surrogate's Court for further action in accordance with opinion.

JAMES J. E. BURKE, Plaintiff, *v.* UNION PACIFIC RAILROAD COMPANY, Defendant.

First Department, July 13, 1917.

Carrier — liability for loss of goods — bill of lading construed — agreement limiting liability of carrier — Interstate Commerce Law construed.

Where a bill of lading covering the entire shipment of merchandise from Japan to the State of New York, and thus including transit across the continent by the defendant railroad, expressly provided that the goods are valued by the shipper at not exceeding $100 per package and that " the liability of the Companies therefor " in case of loss shall not exceed $100 per package, the shipper cannot recover in excess of that sum where the goods were destroyed while being transported by the defendant in this country, even though it is admitted that the real value of the goods was greatly in excess of that stated.

As the agreement was a " through bill of lading " its terms as to value were intended to apply to any of the successive carriers, including the defendant.

Although an interstate shipment, whether originating in this country or abroad, is controlled so far as concerns that portion of the transportation which is interstate, by the Interstate Commerce Law, and the rules, form of contract and classification established in pursuance of that law, nevertheless said law and the schedules filed thereunder do not forbid a limitation of the carrier's liability such as is contained in the bill of lading aforesaid. In fact the 3d section of the uniform bill of lading allows a lower valuation of goods to be agreed upon.

SUBMISSION of a controversy upon an agreed statement of facts pursuant to section 1279 of the Code of Civil Procedure.

*Arthur W. Clement* [*Wilson E. Tipple* with him on the brief], for the plaintiff.

*Oscar R. Houston,* for the defendant.

SCOTT, J.:

The only question at issue in this controversy is the amount of damages which the plaintiff is entitled to recover for the loss of certain goods shipped from Japan to this country and then transported over defendant's railroad. The liability of defendant is not questioned, the only dispute being as to the amount for which it is liable.

The goods, consisting of fifty-six cases of merchandise,

were shipped from Yokohama, Japan, by the Pacific Mail Steamship Company, to be delivered at New York to the shipper's order. It was carried by the steamship company to San Francisco, and there delivered to the Southern Pacific Company, a common carrier, and by that company transported to its junction with defendant and there delivered to said defendant. While in defendant's hands the property was totally destroyed. As has been said the defendant concedes its liability, and it is stipulated that the fair, reasonable and market value of the goods was $17,549.01, for which sum, with interest, the plaintiff demands judgment.

The defendant claims, however, that it is liable for no more than $5,600 with interest. This claim is based upon a clause in the bill of lading issued by the steamship company reading as follows: "It is expressly agreed that the goods named * * * are hereby valued at not exceeding $100.00 per package, and unless a different or other value is expressly written and declared herein, the liability of the Companies therefor, in case of the total loss of all or any of the said goods from any cause, shall not exceed $100.00 per package, and in case of the partial loss of or damage to any of said goods, the liability of the Carriers shall not exceed such proportion thereof per package as the loss or damage on each package shall bear to the sum of $100.00."

This is a very common form of agreement as to value and has frequently been upheld and enforced (*Hart* v. *Pennsylvania R. R. Co.*, 112 U. S. 331; *Greenwald* v. *Barrett*, 199 N. Y. 170), and it is of no moment that the freight charges do not appear to have been based on this valuation of $100 per package. (*Reid* v. *Fargo*, 213 Fed. Rep. 771, 773; affd. on this point, 241 U. S. 544, 551.)

It is also apparent that this agreement as to value was intended to apply to any of the successive carriers. The bill of lading was denominated "through bill of lading," and it called for the transportation of the goods "from Yokohama, via San Francisco to New York." The freight charge was made up of two items, one the ocean rate, and the other the rail rate, and the bill of lading provided that the goods were "to be transported by the Pacific Mail Steamship Company on board the steamship *Persia* * * * from Yoko-

hama unto the Port Of San Francisco, or so near thereto as safe navigation of such vessel or vessels shall then permit * * * and there upon the arrival of said Steamer in like condition to be received by and delivered unto the Southern Pacific Company, the Atchison, Topeka & Santa Fe Railway Company or the Western Pacific Railway Company, or any one of them, and thence to be transported by said Company and connecting Railroad Companies to New York and there in like condition to be delivered unto * * * Order." And finally the clause fixing the valuation of $100 per package (quoted above) speaks of the liabilities of the " companies " and later of the " carriers," which it would not have done if it had been intended to limit the effect of the stipulation as to value to the first carrier, viz., the steamship company.

The plaintiff, however, contends that in so far as concerns the transportation of the goods from San Francisco to New York, the shipment must be regarded as being governed exclusively by the provisions of the defendant's filed classification, tariffs, etc., and the uniform bill of lading on file with the Interstate Commerce Commission, and that since the limitation upon the defendant's liability, contained in the steamship company's bill of lading is not to be found in any of the classifications, tariffs or in the uniform bill of lading, the defendant may not avail itself of the agreement as to value. We have no doubt that the Interstate Commerce Act applied to so much of the shipment as was had by rail after the goods had been landed at San Francisco (See 24 U. S. Stat. at Large, 379, § 1, as amd. by 34 id. 584, § 1, and 36 id. 544, § 7), and inasmuch as the shipper gave no notice that he elected to ship subject to the common-law rules of liability, the shipment, so far as concerns defendant, must, we think, be deemed to have been made under the filed classifications and rates and under the terms of the uniform bill of lading, notwithstanding no such bill was, in fact, ever issued or signed. (See rule 9 of Western Classification No. 53, in force at the time of the shipment and stipulated as a part of the submission.) In other words, an interstate shipment, whether originating in this country or abroad, is controlled, so far as concerns that portion of the transportation which is interstate, by the

Interstate Commerce Law, and the rules, forms of contract and classifications established in pursuance of that law.

Granting this, however, does not serve to sustain the plaintiff's claim. While the filed schedule of classifications, rates, etc., do not in terms provide for such a valuation as was made in this case and a consequent limitation of the carrier's liability, they do not forbid it. The uniform bill of lading, however, does explicitly so provide.

Its 3d section reads as follows: " The amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property (being the *bona fide* invoice price, if any, to the consignee, including the freight charges, if prepaid) at the place and time of shipment under this bill of lading, *unless a lower value* has been represented in writing by the shipper or *has been agreed upon* or is determined by the classification or tariffs upon which the rate is based, in any of which events such lower value shall be the maximum amount to govern such computation, whether or not such loss or damage occurs from negligence."

This section establishes four alternative measures of value or bases of liability. The first is the invoice value, and the third is " a lower value  *  *  * agreed upon." The shipment for the loss of which plaintiff seeks to recover damages falls distinctly within this third class. A lower value than the invoice price had been distinctly agreed upon between the initial carrier and the shipper and had been expressed in the bill of lading. Since, as already said, that agreement was obviously made not only for the benefit of the initial carrier, but for that of each successive carrier, the defendant is entitled to the benefit of it, precisely as if a bill of lading in the uniform form had been issued and the agreement as to value had been written into it.

It follows that there must be judgment for the plaintiff for $5,600, with interest, with costs to the defendant.

CLARKE, P. J., LAUGHLIN, DAVIS and SHEARN, JJ., concurred.

Judgment for plaintiff as stated in opinion, with costs to the defendant. Order to be settled on notice.

TIFFANY STUDIOS, Plaintiff, *v.* JACOB SEIBERT, JR., and Others, as Executors of and Trustees under the Last Will and Testament of WILLIAM B. DANA, Deceased, and Others, Defendants.

First Department, July 13, 1917.

Assignment — when assignee of beneficiary in will entitled to proceeds of lands taken by eminent domain — will — power of sale construed — when condemnation of lands equivalent to sale by testamentary trustees.

Submission of a controversy upon an agreed statement of facts pursuant to the Code of Civil Procedure. The plaintiff, a creditor of a beneficiary under a will and as assignee of her interest in moneys which were the proceeds of lands of the estate taken by eminent domain and held by the executors, claims to be entitled to the share of the assignor and asks ·that the executors be required to pay over the same. The defendant executors contend that, under the terms of the will, the plaintiff's assignor could only become entitled to the proceeds of the land in case they were voluntarily sold by the trustees under a discretionary power given by the will, and that the taking of the lands by eminent domain was not such sale as vested the assignor with any interest in the proceeds.

*Held,* that the taking of the lands by eminent domain was in fact a sale within the meaning of the will which, as construed by the court, entitled the assignor to share in the proceeds without restriction and that the only discretion conferred upon the executors related to the price and terms of sale.

When the proceeds of the lands taken by eminent domain were received by the testamentary trustees in cash they became personal property and subject to distribution under the terms of the will.

LAUGHLIN, J., dissented.

SUBMISSION of a controversy upon an agreed statement of facts pursuant to section 1279 of the Code of Civil Procedure.

*Robert Thorne,* for the plaintiff.

*Winthrop E. Dwight* and *Jacob Seibert, Jr.,* for the defendants Jacob Seibert, Jr., and others.

*Alfred Ely,* for the defendants Davis Collamore & Company, Ltd., and others.

*Harold S. Deming,* for the defendant William Shepherd Dana, individually and as trustee.

DOWLING, J.:

William B. Dana died on October 10, 1910, leaving a last will and testament dated April 12, 1909, and a codicil thereto dated September 13, 1910, which were duly admitted to probate in the county of Suffolk, State of New York, on November 28, 1910. Three separate trusts were created under these instruments. The first was of his holdings of capital stock in the William B. Dana Company, which he left to Jacob B. Seibert, Jr., and Ethel Dana Shepherd in trust, to receive the income thereof for certain designated purposes and periods, with the following provisions: '

" I empower my said trustees, however, at any time in their discretion to sell all of said stock in one block at public or private sale at such prices and upon such terms as they may determine, and to invest and reinvest the proceeds in any manner in their discretion, being free from the usual restrictions as to trustees' investments, the income of such substituted investments to be disposed of in like manner as is above directed with respect to the income of the stock. At the expiration of such trust, I give and bequeath and direct my said trustees to transfer and deliver three hundred shares of said stock, or substituted investments representing the proceeds of sale of such proportion of said stock, to Jacob Seibert, Jr.; * * * and the remainder of such stock or the substituted investments representing the proceeds of sale of the remainder of such stock, I give and bequeath and direct my said trustees to transfer and deliver to William Shepherd Dana."

The second trust (which is the subject of this controversy) is thus set forth in the will:

profits thereof, so long as William Shepherd Dana, my adopted son, shall live and twenty-one years shall not have expired and to pay the same, after the deduction of all proper charges and expenses to the persons entitled to the residue of my estate according to the provisions hereof and in the same proportions. I authorize my executors to lease any or all of said real estate, or at any time during the continuance of this trust to sell any or all of the same at such prices and upon such terms as they may deem advisable. I also empower my executors to mortgage parcels of my real estate for the purpose of providing money for improving such parcels. In the event of any such sale I direct my executors to thereupon terminate the said trust to the extent of the property so sold and to pay the net proceeds of such sale to the persons entitled to the residue of my estate according to the provisions hereof and in the same proportions. Upon the termination of this trust by limitation of time or by the death of my adopted son, William Shepherd Dana, I give and devise such of said real estate as shall then remain unsold to the persons entitled to the residue of my estate according to the provisions hereof and in the same proportions." There is then a third trust created of premises 136 to 140 Front street, New York city, the income wherefrom is to be paid to Ethel Dana Shepherd and William Shepherd Dana for life, and it is provided: " I authorize my executors to lease said premises, or, at any time during the continuance of this trust, to sell the same at such price and upon such terms as they may determine, and to invest and reinvest the proceeds in any manner in their discretion, being free from the usual restrictions as to trustees' investments. The income of such substituted investments to be disposed of in like manner as above directed with respect to the rents, issues and profits of the said premises. Upon the death of both Ethel Dana Shepherd and William Shepherd Dana, I direct my executors to convey the said premises or to transfer and pay over the investments representing the sale of said premises to the issue of William Shepherd Dana, or if there be no such issue, then to the person entitled to the residue of my estate, according to the provisions hereof and in the same proportions."

The testator then devised his land at Mastic, N. Y., to Ethel